19857

BRIARCLIFFE ACRES et al., Appellants, v. BRIARCLIFFE
REALTY COMPANY, INCORPORATED, Respondent

(206 S. E. (2d) 886)

*Messrs. Quinn, Gottlieb & Faucette,* of Columbia, *for Appellants,*

*Messrs. Burroughs, Green & Sasser,* of Conway, *for Respondent,*

July 11, 1974.

LITTLEJOHN, Justice:

The plaintiffs-appellants are certain individuals, who own real estate within the Briarcliffe Acres Subdivision located near Myrtle Beach, South Carolina, and Briarcliffe Acres, which is an eleemosynary corporation. The individuals bring this action in their own behalf and as representatives of a class of property owners similarly situated.

The defendant-respondent, Briarcliffe Realty Company, Incorporated, is a business corporation which owned 640 acres of land and has developed, and is developing, it into a residential community known as "Briarcliffe Acres Subdivision."

In 1954 the realty company undertook to vest in the eleemosynary corporation certain rights of management and control over the roads, parks, lakes and beachfront areas (hereinafter called the common areas) in the subdivision. In 1968 the realty company undertook to revoke those rights.

This action was commenced by the plaintiffs to enjoin the defendant realty company from interfering with the exercise of management and control by the eleemosynary corporation. Whether or not the injunction should be granted depends largely upon an interpretation of a written declaration, dated July 12, 1954, by the realty company. The complaint asked the court to issue a declaratory judgment under § 10-2001 *et seq.* of the Code of Laws of South Carolina for 1962.

The plaintiffs contend that the "Declaration" vests in the eleemosynary corporation a perpetual right or easement of management and control of the Briarcliffe Acres Subdivision, including the lakes, roads, parks, easements, beach front areas, and other similar facilities existing in the subdivision.

The defendant denies there was ever any intent to grant such permanent management and control to the eleemosynary corporation, and denies that such permanent management and control was granted; additionally, defendant contends that if the right of management and control was granted, it was a revocable right subject to conditions and reservations, and that the defendant effectively and rightfully revoked the rights. It is further the defendant's contention that the individual plaintiffs are entitled only to the rights which are set forth in their deeds.

The parties are also in dispute as to what area constitutes the beach front referred to in the declaration. There is additionally in contest what right, if any, the realty company has to modify the subdivision plan by changing the size or shape of lots, the width, grade and direction or location of streets, and the closing of streets, provided such changes do not affect lots previously sold.

The case was referred to and heard by the Master in Equity. He found that the realty company intended to and did grant the eleemosynary corporation a perpetual right and easement to control and manage the common areas for the general use of the property owners. He defined the

beach-front area by reference to defendant's exhibit 2, a plat entitled "First Portion of Briarcliffe Acres Incorporated," dated November 11, 1946, and recorded in the office of the Clerk of Court for Horry County on November 12, 1946. (This plat delineates a beach-front area of approximately 900 linear feet; the remainder of the beach front is divided into 21 lots which vary in width from 76 feet to 102 feet.) The result of this is to designate about 900 feet as "common area" and leave about 2700 feet in fee to be sold by the realty company.

Both plaintiffs and defendant excepted to the master's report. After a hearing, the trial judge issued his decree reversing the master in part. He held that the right granted the eleemosynary corporation to control and manage the common areas was a license revocable by its terms and not an easement in perpetuity. The judge affirmed the master's holding that the beach-front area was indicated by defendant's exhibit 2, and that the realty company had the right to modify the plan.

In this appeal, plaintiffs allege error on the part of the trial judge in refusing the injunction, in failing to hold that the eleemosynary corporation had a perpetual right and easement to control the common areas, in failing to hold that the realty company was estopped to deny the rights of the plaintiffs, in improperly designating the beach-front area, in failing to hold that the realty company was estopped to deny that the beach-front area was as contended for by the plantiffs and shown on plaintiffs' exhibit 24, and in holding that the realty company had reserved the right to modify the subdivision plan by making changes which did not affect any lot previously sold.

Plaintiff's exhibit 24 (plat) shows about 3600 feet of beach front with no building lots indicated. Instead it indicated "reserved for cabana sites." If this plat is controlling there will be 3600 feet of common area beach front instead of 900 feet. The plat is dated October 1, 1954.

A summary of the facts leading up to the commencement of this action is necessary for an understanding of the issues involved:

In 1954, the realty company owned the Briarcliffe Acres Subdivision. It contained 640 acres and was approximately one mile square, fronting on the Atlantic Ocean and bounded on the northwest by the intracoastal waterway. At that time, K. C. Ellsworth owned 45% of the stock in the company, and the development is a prolongation of his vision and plan. It was his idea to develop a retirement community governed to a degree by the property owners therein. Plats of the property show roads, parks, inland lakes, beach-front areas, and building lots. Ellsworth was, for all intents and purposes, the corporation from 1954 until he sold his stock in 1966. At that time Charles S. Krampf (owner of 51% of the stock) became President, and he has apparently been in control of the company's business since that time. It was he who in 1968 attempted to revoke the rights which had been granted to the eleemosynary corporation.

On June 8, 1954, Briarcliffe Acres, an eleemosynary corporation, was charted by the Secretary of State. Its managers, trustees, directors and officers were W. H. Sory, James E. Cooney, and Florentine L. Cooney, all active in Briarcliffe Realty Company, Incorporated. The purpose of the corporation is set forth in Article 4 of its Constitution and By-Laws, as follows:

"The purpose of this corporation or association shall be to promote and improve the community of Briarcliffe Acres Development, to organize a social club, and to do all things therein and thereunder to advance good neighborly feelings and brotherhood, to promote a governing body of the community to better formulate and carry out policies and programs of the community, and to extend help and aid to its members in the community of Briarcliffe Acres Development.

"That by virtue of the recorded maps and plats showing the general development plan for Briarcliffe Acres Development, showing also thereon, roads, easements, parks, lakes, and other facilities existing an nonexisting at the present time, together with the beach front area as reserved, this organization and association has as its purpose to organize and control the use of these various and sundry facilities to the best advantages to the community, and in connection therewith to organize and formulate rules, regulations and controlling uses of same. That in connection with the formation of the above, the majority vote of those members present at the annual meeting as afore set out, shall carry and formulate the laws and policies of this association, and shall be controlling factors for the Board of Directors, and officers of the corporation to adhere to; provided further however, that under no conditions shall an assessment of members for any purpose be promoted and carried save and unless a seventy-five (75) per cent of all members of the association be in favor of the same; provided also that any member of the association shall under no circumstances be obligated under any assessment, but may in the alternative withdraw his membership without prejudice."

On July 12, 1954, while Ellesworth was in charge, the Board of Directors of the realty company adopted a resolution in pertinent part as follows, as reflected by the minutes of a meeting of the Board of Directors:

"The secretary then presented and read the call of this meeting, its purpose being to consider and act upon the organization of the association known as Briarcliffe Acres. It was discussed and attention called to the purposes of the association of Briarcliffe Acres as set forth in the constitution and By-laws, and the purpose of this meeting was to consider the same, with respect to the association of Briarcliffe Acres being given the control and management of such property as shown on recorded maps and plats showing the general development plan of Briarcliffe Acres development, with reference more particularly to roads, easements,

parks, lakes, and other facilities existing and nonexisting at the present time, together with also the beach front area as reserved.

"With respect to the above, a motion was duly made and seconded, and the following resolution was unanimously adopted:

" 'WHEREAS, the association and corporation of Briarcliffe Acres has been organized for the purpose as set forth more particularly in Article Four (4) of its constitution and By-Laws, of which a copy of same is attached hereto and made a part hereof; AND WHEREAS, it is necessary that Briarcliffe Realty Company, Inc., deliver to the association of Briarcliffe Acres the authorization of management and control of parks, lakes, lots, easements, beach-front area, and other facilities for the use of the community, existing and nonexisting at the present time;

" 'THEREFORE, BE IT RESOLVED that the President or Vice-President, and the Secretary of this corporation be authorized and directed to sign and execute a declaration presenting the organization of Briarcliffe Acres with the authorities, powers, control, and management as aforestated.'

". . . [A] and further in view of the motion carried adopting the organization and plans of Briarcliffe Acres with its uses and control thereunder, that Restriction H henceforward be changed and altered to read as follows, to wit:

" 'That all privileges, rights, and uses of property controlled by the association of Briarcliffe Acres shall be subject to the rules and regulations of said association as laid down from time to time, and the grantee herein takes aforedescribed property with due notice hereof this reservation.' "

On the same day (July 12, 1954), the Board of Directors of the Briarcliffe Realty Company issued its declaration, which was recorded in the office of the Clerk of Court for Horry County, in pertinent part as follows:

"KNOW ALL YE MEN BY THESE PRESENTS, That Briarcliffe Realty Company, Inc., a corporation duly organized and existing and by virtue of the laws of the state of South Carolina in consideration for property consisting of Lots situate in the Briarcliffe Acres Development as sold and to be sold, and in consideration for the management and control of the parks, lakes, lots, easements, beach-front area, and other facilities for the use of the community, existing and nonexisting at the present time, by the association of Briarcliffe Acres, a corporation, and in consideration for the necessity of change of certain restrictions flowing hereafter and contained in the deeds hereafter of Briarcliffe Realty Company, the said Briarcliffe Realty Company, Inc., does herewith make this declaration for the uses and purposes stated hereafter, to wit:

"THAT WHEREAS, the association and corporation of Briarcliffe Acres has been organized for the purposes as set forth more particularly in its constitution and by-laws, of which a copy of same is attached hereto and made a part hereof, reference being craved more particularly to Article 4, of said constitution and by-laws, wherein, the said Briarcliffe Acres, an association and corporation is to manage and control the parks, lakes, beaches, and other facilities for the use of the community, existing and nonexisting at the present time; and

"WHEREAS, these facilities aforementioned have not heretofore been in any way dedicated to public use or to property owners use;

"NOW THEREFORE, Briarcliffe Realty Company, Inc., does hereby vest with Briarcliffe Acres, a corporation, the rights, powers and privilege of management and control over these properties, to wit: the lakes, parks, roads, easements, beach-front areas and other facilities of nature and kind for the general use of the community and more particularly shown on recorded maps and plats of Briarcliffe Acres Development, said management and control over said prop-

erties being in keeping with the constitution and by-laws of the said Briarcliffe Acres, a corporation above referred to and attached hereto.

"BE IT FURTHER KNOWN, that henceforth Briarcliffe Realty Company deeds shall contain along with the other usual restrictions, the restriction as follows, to wit:

" 'That all privileges, rights, and uses of the property of the Briarcliffe Acres Development as controlled by the association of Briarcliffe Acres, shall be subject to the rules and regulations of said association as laid down from time to time, and the grantee herein takes afore-described property, with due notice hereof this reservation.'

"The afore setout restriction constitutes and is a follow through of Briarcliffe Realty Company, Inc., in cooperation with Briarcliffe Acres, promoting and facilitating the management and control of certain properties of the Briarcliffe Acres Development, however it is expressly reserved that this declaration is not to be construed as a dedication of any of these properties, rights, or privileges to any public use."

On September 8, 1954, the Board of Directors of the Briarcliffe Realty Company adopted a resolution directing the President and Secretary to issue a new declaration amending the declaration of July 12, 1954. That amending declaration, executed on the same day, read in pertinent part as follows:

"KNOW ALL MEN BY THESE PRESENTS, That Briarcliffe Realty Company, Inc., a corporation, duly organized and existing under and by virtue of the laws of the state of South Carolina in consideration of a Declaration heretofore made vesting certain powers of management and control in Briarcliffe Acres, an eleemosynary corporation (said Declaration being dated July 12, 1954, recorded in the Clerk's Office for Horry County in Deed Book 142 at page 16), the said Briarcliffe Realty Company, Inc., does hereby make this Declaration of Intent and purposes, to wit:

"WHEREAS, under action taken at a special meeting of the Board of Directors directing the President and Secretary of the corporation to forthwith issue this Declaration,

"NOW THEREFORE BE IT KNOWN TO ALL CONCERNED:

"That the management and control as vested in Briarcliffe Acres, presently, applies to those elements of the subdivision of Briarcliffe Acres development consisting in general of lakes, beachfront, roads, parks, and such other facilities as are of free use to the property owners of the Briarcliffe Acres development.

"BE IT FURTHER DECLARED, that it is not to be construed however that this power of management and control of such as aforestated is an irrevocable power, however, BE IT KNOWN BY REASON HEREOF, that so long as reasonable control and mangement are practiced by the association of Briarcliffe Acres in a nonprofitable manner, in accordance with the true intent and nature of a fraternal, eleemosynary organization and so long as such control as practiced is beneficial to the majority of the property owners, such mangement and control will be allowed to remain with the association of Briarcliffe Acres. Such vesting however of mangement and control is not intended to be any dedication or conveyance of any title to any such properties of Briarcliffe Realty Company, Inc."

Thereafter, (until April 12, 1968) all deeds conveying lots in the subdivision to the many various purchasers (about 200) contained the restriction and reservation set out in the declaration of July 12, 1954. In the deeds it was denominated restriction (g). Restriction (h) read, "The conditions, limitations and restrictions hereinbefore made shall be deemed covenants running with the land, binding on both the grantor and the grantee, their heirs, successors and assigns."

The recorded maps and plats of the general development plan referred to in the declaration, which maps are dated in 1946 and 1947, contain the following reservation:

"All of the area not included in numbered lots or reserved for future development is intended for streets, parks and other community uses by the residents of Briarcliffe Acres, Inc., but in recording this map the Owners expressly reserve the full, free and exclusive right to these areas laid on the land of said Owners for the following purposes: waterworks, water pipes, gas pipes, sewers, street lights, electric power lines, telegraph and telephone lines, parks, playgrounds, club house, and other public or quasi-public uses.

"The Owners also reserve the right to modify this plan by changing the size or shape of lots, width, grade, direction or location of streets; and abolishing or closing streets, provided no such changes are made in the neighborhood of, or in such manner as to affect in any way any lot which may have previously been sold, unless with written consent of the Owners of all such lots. The areas intended for public use are not dedicated to the public but are expressly reserved by the Owners to be used and enjoyed, subject to conditions above stated, by those owning or occupying building sites shown thereon, and use of the same by the public shall not be treated or construed as a dedication thereof to public use."

A plat, dated October 1, 1954 (after the declaration and amendment), contained in essence the same reservations but with changes indicated as follows:

"All of the area not included in numbered lots or reserved for future development is intended for streets, parks and other communty uses of the residents of Briarcliffe Acres, but in recording this map the Owners (Briarcliffe Realty Company, Inc.) expressly reserve the full, free and exclusive right to these areas laid on the land of said Owners (Briarcliffe Realty Company, Inc.) for the following purposes: waterworks, water pipes, gas pipes, sewers, street lights, electric power lines, telegraph and telephone lines, parks,

playgrounds, club house and other public or quasi-public uses.

"The Owners (Briarcliffe Realty Company, Inc.) also reserve the right to modify this plan by changing the size or shape of lots, width, grade, direction or location of streets, and abolishing or closing streets, providing no such changes are made in neighborhood of, or in such a manner as to affect in any way, any lot which may have previously been sold, unless with written consent of the Owners (Briarcliffe property owners) of all such lots.

"The areas intended for public use are not dedicated to the public (Briarcliffe property owners) but are expressly reserved by the Owners (Briarcliffe Realty Company, Inc.) to be used and enjoyed, subject to conditions as set forth from time to time by Briarcliffe Realty Company, Inc., by those owning or occupying building sites shown hereon, and use of the same by the public or residents of Briarcliffe Acres, shall not be treated or construed as dedication thereof to public use."

On May 10, 1967, Charles E. Krampf, President, and John A. Courtney, Manager of Briarcliffe Realty Company, wrote "To the Residents of Briarcliffe Acres" as follows:

"(5) We ask all Residents and Property Owners to remember that Briarcliffe Realty Co., Inc. owns title to all roads, lakes, beach property and other quasi-public areas, and has only issued a dedication for their proper use to the Property Owners of Briarcliffe Acres."

On April 12, 1968, Briarcliffe Realty Company wrote the landowners advising them that they were revoking the right of management and control. That letter precipitated this action.

None of the common areas have been dedicated to public use. Title therefore to the common areas is privately owned. The Court is confronted with the problem of determining the respective rights of the parties to that property we have re-

ferred to as the common areas. The parties have failed to specifically spell out what their relative rights should be. The relationship of the parties must be determined from the facts including the instruments quoted as set forth hereinabove.

We must construe the written instruments, including the declarations. The declaration and the amendment are without a doubt ambiguous. The instruments are invitations to litigation. The instruments are ambiguous because of what they say, but more particularly by reason of what is omitted. For example, such questions remain unanswered as:

1. Where is title to the common areas?

2. Who pays taxes on the common areas before the subdivision is completed, and after the subdivision is completed?

3. Does the right to maintain and control the common areas include the duty?

4. What happens when the realty company completes the development and/or dissolves?

5. The common areas, especially the beach-front area, are not clearly defined.

6. Reference is made to recorded plats, but several were recorded at the time.

Because of the ambiguities, the Court is at liberty to look beyond the instruments involved in an effort to determine the true intent of the parties.

The defendant realty company is a corporate entity. It can only act through its agents. The acts of Ellsworth and the acts of Krampf are both the acts of the corporation. Obviously, their intent was greatly different. Ellsworth testified:

"A. Through the eleemosynary corporation it was my plan to have every property owner a shareholder in the eleemosynary corporation, and have these quasi-public areas vested in the eleemosynary corporation so that the people in Briarcliffe could operate the eleemosynary corporation and

retain these properties inviolate, insofar as public invasion was concerned."

He further testified:

"Q. Mr. Ellsworth, in your discussions with these prospective purchasers, what representations, if any, were made by you as to the use of the beachfront areas, the lakes and the parks, and I am speaking to the beachfront, the parks and lakes that were shown on the recorded plats of the property?

"A. Well, I made a point of stocking those lakes with fish so that every property owner could have the privilege of fishing in those lakes and, also, I discussed with them many times that some day, when the eleemosynary corporation takes over, that efforts should be made to beautify these park areas and become part of their property."

On the other hand, the position which the realty company now takes through its President Krampf is reflected by his own testimony as follows:

"Q. Do you recall having made a statement that it was the position of the Realty Company that the Realty Company owned all of the property in Briarcliffe Acres with the exception of the lots that had been sold and that the Realty Company could do with the remaining property as it pleased?

"A. I do.

"Q. And is that the position of the Realty Company now?

"A. Yes."

Later in his testimony he waters down this position.

We are of the opinion that the eleemosynary corporation was granted more than a mere license, as held by the lower court. There can be little doubt that from 1954 to 1966, while Ellsworth was in charge of the corporation's business, it was his intent, and he used it as a selling point for the benefit of the realty company, that the common areas end up in complete control of the eleemosynary corporation. Although the declaration of July 12, 1954, did not use the word "easement," an easement was actually

intended. We think the effort to amend the declaration on September 8, 1954, is entitled to little, if any, weight in construing the earlier declaration for the reason stated in *Church v. Moody*, 98 S. C. 234, 82 S. E. 428 (1914), wherein this Court held that the construction placed on a deed by the grantor after its execution is immaterial in its interpretation.

The wisdom of this proposition from Church is keenly demonstrated by the facts of the instant case. Notwithstanding the fact that, on September 8, 1954, the same people were the officers of the realty company and the eleemosynary corporation, which in itself appears to have involved a conflict of interests, the eleemosynary corporation was not a party to the Septemeber 8 declaration, and those whose interests were involved, namely, the property owners in the subdivision, did not participate therein.

As evidence of the true intent of the realty company, President Ellsworth, on February 13, 1961, wrote a prospective purchaser as follows:

"In 1952 [obviously meaning 1954] we formed an Eleemosynary Corporation and dedicated the ocean front, lakes, and roads, approximately thirty-five acres of parks, to the corporation."

On June 1, 1966, Mr. Able, attorney for the realty company, wrote J. G. Green, as follows:

"[P]lease be advised that by reason of the subdivision map as being recorded of public record showing the outlay of roads, and the subdivision as planned, this acts as a (sic) offer to dedicate the same, which by the act of acceptance in purchasing in the subdivision, the property owners have the rights of ingress and egress to their property. . . . In this pamphlet you will see that the control of the lake areas, beach areas, roads, etc., are placed with this association, which is composed of the property owners in the subdivision. This association has no power to close any of the roads as layed (sic) out in the subdivision, and the association has as its context, an object for the future, development of Briarcliffe

Acres, a simulated control of the same by the property owners if they so desire. This has been a dormant association up until the present time. Therefore, in conclusion, it is my opinion that there is no need for Briarcliffe Realty Company to grant rights, that have already been dedicated for such purpose and use."

Even though President Krampf, by his testimony would apparently take the position that the attempted revocation restored the realty company to its original position, counsel in argument do not go so far as to contend that the revocation wiped out all of plaintiffs' rights in the common areas. Counsel understandably declined to define such rights as he conceived plaintiffs to have. Argument that the plaintiffs end up with no interest in the common areas has little appeal. If they have anything, it must be (1) a dedication, or (2) an easement, or (3) a revocable license. There can be no dedication in this case in the usual sense of the word. This Court, in *Derby Heights, Inc. v. Gantt Water and Sewer District*, 237 S. C. 144, 116 S. E. (2d) 13 (1960), defined that term as: "Dedication is the intentional appropriation of land or of an easement therein, for some proper public purpose." No one argues that the public has any rights in the common areas, and accordingly there can be no dedication.

A license in real property is defined as "a personal, revocable, and unassignable privilege, conferred either by writing or parole, to do one or more acts on land without possessing any interest therein. . . ." 25 Am. Jur. (2d) Easements and Licenses § 123 (1966). A license which is not revocable would, of course, amount to an easement.

In the declaration of July 12, 1954, the realty company said:

"WHEREAS, these facilities aforementioned have not heretofore been in any way dedicated *to public use or to property owners' use;*" (emphasis added)

The resolution went on to say:

"The afore setout restriction constitutes and is a follow through of Briarcliffe Realty Company, Inc. in cooperation with Briarcliffe Acres, promoting and facilitating the management and control of certain properties of the Briarcliffe Acres Development, however it is expressly reserved that this declaration is not to be construed as a dedication of any of these properties, rights, or privileges *to any public use.*" (emphasis added)

It is clearly inferable that the realty company intended a dedication to private use, and a dedication to private use is in actuality nothing more or less than an easement. It is obvious from the whole of the testimony that until control of the realty company shifted from Ellsworth to Krampf, the corporation treated the property owners and the eleemosynary corporation as owners of an easement. The position of Krampf is completely different from the position of Ellsworth, and this is reflected throughout the testimony. The relationship of the plaintiffs with the realty company was fixed by the time Krampf took over control of the corporation, and the position he would now take is untenable.

Normally, when one develops a subdivision and sells lots by reference to a plat, there is an implied dedication of the roads to the use of the lot owners and of the public unless an intent clearly appears otherwise. No one would seriously argue that these lot owners do not have the right to use the roads. Under the facts of this case, one cannot logically make a distinction between the rights of the property owners to the use of the roads on the one hand and to the use of the parks, lakes and beach areas on the other.

We conclude that the plaintiffs have an easement to use the common areas. It logically follows that the easement is in perpetuity, and is not revocable.

The master held, and the judge agreed, that the beach-front area was shown on defendant's exhibit 2. This plat

shows 21 beach-front building lots. It would indicate about 900 beach-front feet as common area and about 2700 feet left for sale by the realty company.

By proper exceptions the plaintiffs appeal, alleging error on the part of the lower court in adopting this plat and in failing to adopt plaintiffs' exhibit 24 (plat), which showed no beach-front lots and about 3600 feet as common area. It is the contention of the plaintiffs that a proper interpretation of the declaration requires a holding that this was intended and, further, that the defendant should be estopped to deny that plaintiffs' exhibit 24 indicated the common area beach front because sales were made by reference to it.

The issue is obviously an important one. The lower court has in effect determined that the realty company owns fee simple title to these 21 lots, and has determined that the plaintiffs have no easement or right of enjoyment of the same. The common areas were designated in the declaration, quoted hereinabove, merely as "the lakes, parks, roads, easements, beach-front areas and other facilities of nature and kind for the general use of the community and more particularly *shown on recorded maps and plats of Briarcliffe Acres Development, . . . .*" (emphasis added) At the time this declaration attempted to indicate the common areas, there were recorded five (5) Briarcliffe Subdvision Properties plats. Two of them did not show any beach-front property. Three of them indicated beach-front property, each in a different way: defendant's exhibit 1 showed ten (10) beach-front lots; defendant's exhibit 2 showed twenty-one (21) beach-front lots; defendant's exhibit 3 showed no beach-front lots. There is nothing in the evidence to indicate which of these three recorded plats was referred to in the declaration. About three weeks after the amended declaration of September 8, 1954, to wit, on October 1, 1954, another plat (plaintiffs' exhibit 24) was prepared and used by Mr. Ellsworth to sell lots by. This plat, in lieu of showing building lots on the beach-front, indicated that the beach-front

was "reserved for cabana sites." It was a part of the selling scheme that cabanas could be built in this area by the many property owners.

A study of the pleadings indicates that the court was not asked to designate the beach-front or the common areas.

The answer of the defendant asserted that the declaration was null and void because the geographical areas referred to were too vague, indefinite and uncertain. It is unfortunate that the master and the lower court attempted to determine the beach-front area. It simply was not an issue before the court and sufficient evidence to determine a matter of this magnitude was not submitted. We agree with counsel for the defendant when in his brief he stated: "There is no allegation in the complaint as to what comprises the beach-front, nor does the complaint allege an estoppel as to what comprises the beach-front." The same is true of the answer.

Plaintiffs argue that the master and the lower court erred in holding that defendant's exhibit 2 determined the common areas instead of plaintiffs' exhibit 24. In the lower court, by exception to the master's supplemental report, the plaintiffs submitted that the master erred in finding that defendant's exhibit 2 showed the common areas, because "there was no evidence introduced during the trial of this matter to furnish any basis for the aforesaid findings." The exception should have been sustained. Plaintiffs should have an opportunity to prove, if they can, that their exhibit 24 shows the beach-front common area. The case is remanded to the lower court so that the parties hereto may, upon proper pleadings, have this issue determined, along with any others not heretofore decided.

The last question submitted by the appellants, as taken from their brief, is as follows:

"Is the right of management and control vested in the Plaintiff Briarcliffe Acres, by the Declaration of July 12,

1954, subject to the reservation by the owner, Briarcliff Realty Company, Incorporated, reserving the right to modify the plan of Briarcliffe Acres by changing the size or shape of lots, the width, grade and direction or location of streets and abolishing or closing streets, provided no such changes are made in such manner as to affect in any way any lot which has previously been sold."

It would appear that the defendant has sold a small portion of "park area" to an adjoining property owner. In argument before this Court, it was asserted that this matter is already the subject of separate litigation. Based on the record before us, we would not be justified in determining whether the action of the defendant in making the sale was proper. We cannot say that the reservations included on the plats, and quoted hereinabove, are invalid. The validity of each action taken by the defendant under these reservations must be determined on an ad hoc basis in the light of whether or not it affects "in any way any lot which may have previously been sold, . . . ."

Reversed in part; affirmed in part; and remanded.

Moss, C. J., and Lewis, J., concur.

Bussey and Brailsford, JJ., concur in part and dissent in part.

Brailsford, Justice (concurring in part and disenting in part):

Construing the majority opinion as holding that the right of mangement and control of the common areas vested in the eleemosynary corporation for the benefit of the lot owners by the declaration of July 12, 1954, was not revocable at the will of the realty company, and that the attempted revocation of April 12, 1968, was nugatory, I concur in that holding.

I also agree that questions arising under the attempted reservation by the realty company of a limited right to mod-

ify the plan for Briarcliffe Acres can best be decided on a case by case basis.

I respectfully dissent from refusal of the majority to pass upon the exceptions assigning as error the court's conclusion that the common beach-front area referred to in the declaration is that shown on defendant's exhibit 2, (some 900 feet in width, with front-beach building lots on each side) instead of that shown on plaintiffs' exhibit 24, (some 3600 feet in width with no front-beach building lots). The apparent ground of refusal is that the issue was not raised by the pleadings, hence was not before the court and should not have been decided. But it can be fairly argued that this issue was raised by the fifth defense of the answer, and the parties have stipulated in the statement of the case that "the definition of what constitutes beachfront area has been made by the pleadings."

The majority opinion states that plaintiff's execption to the supplemental report of the master, challenging, for lack of any supporting evidence, the finding that the front-beach area was that shown on defendant's exhibit 2, should have been sustained, and continues, "Plaintiffs should have an opportunity to prove, if they can, that their exhibit 24 shows the beach-front common area. The case is remanded to the lower court so that the parties hereto may, upon proper pleadings, have this issue determined, along with any others not heretofore decided."

But the parties have had their day in court on this issue, and plaintiffs do not seek another opportunity to present evidence. Instead, they except to this finding on the ground, among others, that the evidence "unequivocally established that the beach-front area" was that shown on plaintiff's exhibit 24.

The declaration of July, 1954, on which plaintiffs have based their case, identifies the common beach-front area only by reference to "recorded maps and plats of Briarcliffe Acres." A latent ambiguity arises because as of that date

three maps, defendant's exhibits 1, 2 and 3, showed beach-front property, each in a different way. However, plaintiff's exhibit 24, which was not recorded until October 1, 1954, was not referred to in the declaration.

Nothing before us fairly suggests that any evidence on this issue not already presented is available to either party. In my view, we should decide on this record whether plaintiffs' exceptions to the concurrent findings below are meritorious.

The opinion states: "The lower court has in effect determined that the realty company owns fee simple title to these 21 lots [front-beach lots shown on defendant's exhibit 2], and has determined that the plaintiffs have no easement or right of enjoyment of the same." I disagree. Affirmance of the judgement on this issue would not foreclose any rights in the beach area which plaintiffs and other grantees of lots described by reference to the plat of October 1, 1954, may have acquired under their deeds. Cf. *Epps v. Freeman*, 261 S. C. 375, 388, 200 S. E. (2d) 235, 242. Only those rights arising under the declaration of July, 1954, are at issue in this action.

BUSSEY, J., concurs.